## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 1:08-CR-00283** |
| | : | |
| **v.** | : | **Chief Judge Kane** |
| | : | |
| **FRANK E. KLIMOVITZ,** | : | |
| **Defendant** | : | |

## MEMORANDUM

On July 29, 2010, the Court held a sentencing hearing at which the Government and

Defendant Frank Klimovitz presented evidence related to the amount of loss resulting from the

offense to which Klimovitz pled guilty.  See U.S.S.G. § 2B1.1, app. n.3.  This memorandum

serves as a summary of the Court's findings as to the amount of loss calculation.

## I.      LEGAL STANDARD

The appropriate burden for finding sentencing facts, including loss amount, is by a

preponderance of the evidence.  United States v. Ali, 508 F.3d 136, 145 (3d Cir. 2007) (citing

United States v. Grier, 475 F.3d 556, 561 (3d Cir. 2007) (en banc)).[1]  "'The court need only

make a reasonable estimate of the loss.'"  Id. at 561 (quoting U.S.S.G. § 2B1.1, app. n.3(C)).  The

Third Circuit Court of Appeals will "accept the District Court's factual finding as to the amount

of loss unless it is clearly erroneous."  United States v. Brennan, 326 F.3d 176, 194 (3d Cir.

---

[1] "[A] preponderance of the evidence is defined as: 'Evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is evidence which as a whole shows that the fact sought to be proved is more probable than not.'" Greenwich Collieries v. Director, Office of Workers' Comp. Programs, 990 F.2d 730, 733 (3d Cir. 1993) (quoting Black's Law Dictionary 1182 (6th ed. 1990)), aff'd, 512 U.S. 267 (1994).
    Klimovitz argues that the Court should apply a "clear and convincing" standard and cites to a decision from the Ninth Circuit.  (See Doc. No. 61 at 1 (citing United States v. Munoz, 233 F.3d 1117 (9th Cir. 2000)).)  Under Grier, however, that is not the applicable standard.

2003).

## II.    BACKGROUND

On July 15, 2008, a one count Information was filed against Klimovitz charging him with

violating 18 U.S.C. § 1341 (mail fraud).  Specifically, Klimovitz was charged with defrauding

his employer, Jaxxi Products and Design ("Jaxxi"), via a fictitious product sales and invoice

scheme from September 2007 to May 2008.  (See Doc. No. 1.)  On July 15, 2008, the

Government filed a plea agreement.  (Doc. No. 3.)  According to the agreement, Klimovitz

would plead guilty to the one count.  (Id. ¶ 1.)  The parties agreed that "the amount of the loss

resulting from the defendant's actions [would] be determined by the Court at the sentencing

hearing."[2]  (See id. ¶ 7.)

On March 17, 2009, Klimovitz was sentenced on the one count in the Information.  This

Court imposed a sentence of twelve months and one day, a $5000 fine, a $100 special

assessment, and three years of supervised release.  However, on May 18, 2010, in part because

no amount of loss hearing had been requested by defense counsel, the Court granted Klimovitz's

motion to vacate his sentence pursuant to 28 U.S.C. § 2255 and reopened the case for re-

sentencing.[3]  (See Doc. No. 52.)  To that end, the Court held a sentencing hearing on July 29,

---

[2] As is more fully addressed by this Court in its memorandum vacating Klimovitz's
original sentence under 28 U.S.C. § 2255 (see Doc. No. 52), a handwritten amendment was
added to the twelfth paragraph of the plea agreement on September 2, 2008.  The handwritten
amendment stated that if Klimovitz paid $351,990 restitution at the time he entered his guilty
plea, the Government would agree to join him in a motion for departure based upon
extraordinary acceptance of responsibility and would recommend probation.
    Klimovitz has made no indication that he seeks to recoup the $351,990 he has already
paid, apparently directly to the victim.

[3] Klimovitz's voluntary surrender date was continued pending the resolution of his §
2255 motion.

2010, at which both parties presented evidence concerning the amount of loss caused by

Klimovitz's wrongdoing. The Government produced the testimony of Lee Sponaugle and Erin

Shirmer. Sponaugle was the sole owner of Jaxxi, a candy co-packing company which designed

and created private label candy gift items. Shirmer is a certified public accountant, who

functionally served as Jaxxi's chief financial officer.

At the July 29, 2010 hearing, Sponaugle testified that Klimovitz was hired by Jaxxi to

help increase sales to $8 million by 2008. Klimovitz would receive a commission on everything

he sold over $1 million dollars, with a cap of $15,000 in commissions. If Jaxxi reached its $8

million goal, Klimovitz was to receive a bonus. In the latter part of 2007, Klimovitz reported a

sale of $750,000 worth of Jaxxi product to Big Lots for $1.3 million.[4] This alleged sale required

Jaxxi to import approximately 200,000 tins from China and to purchase one million ounces of

chocolate from the Hershey Company. The process of preparing the order took about six weeks.

Before the order was delivered, Klimovitz informed Sponaugle that the order had been cancelled.

A week later, Klimovitz found two other outlets for the already-assembled Jaxxi tins: Infinity

Sales ("Infinity") and Kenny's. Klimovitz represented that the purchase order amounts for the

sales to Infinity and Kenny's were the same as for Big Lots ($1.3 million). Yet after Jaxxi

shipped the order to Infinity and Kenny's, it became clear that the amount agreed to by Infinity

and Kenny's was much lower. Indeed, rather than negotiating to sell the $750,000 in product for

$1.3 million, Klimovitz had arranged to sell it for just over $600,000. By the time this

discrepency became clear to Sponaugle, Klimovitz had already been terminated. Before his

---

[4] According to Sponaugle's testimony, it later came to light that there never was a Big
Lots order. Rather, the Big Lots production orders turned in by Klimovitz were forgeries.

termination, Klimovtz was paid a $16,000 bonus and $7,000 in commissions from the non-existent Big Lots deal.

Sponaugle tasked Shirmer with the responsibility of determining the amount of loss Jaxxi had suffered from the misrepresentations by Klimovitz. Shirmer testified that to prepare her calculation of the loss, she relied on Jaxxi's QuickBooks accounting ledger. She calculated the direct cost of the inventory, shipping costs, payment by Infinity and Kenny's, as well as the indirect costs which were allocable to those orders. Her review resulted in Excel spreadsheets which the Government produced as exhibits at the July 29, 2010 sentencing hearing.

### III. DISCUSSION

The burden to prove the amount of loss is on the Government. The Government has put forward evidence that the amount of loss suffered by the victim was $329,359.[5] The Government arrives at this calculation amount based on three components: (1) Jaxxi's cost of manufacturing and shipping the Infinity and Kenny's product ($938,122); plus (2) the commission and bonuses paid to Klimovitz that he did not earn ($23,000); minus (3) the monies Jaxxi received on the "grossly discounted sales" ($631,763).[6] (Doc. No. 60 at 1, 6.) The parties agree as to third component amount, that Infinity and Kenny's paid $631,763 to Jaxxi.[7] (See Doc. No. 60 at 6; Doc. No. 61 at 4.) The Court will address the first and second component

---

[5] The Government's brief states in its opening and closing that the amount of loss was $329,529 (see Doc. No. 60 at 1, 9), but in its analysis it states the loss was $329,359 (id. at 6). After independently calculating the numbers provided by the Government, the Court concludes that the correct sum would be $329,359.

[6] In making reference to the amounts at issue in this case, the Government "rounds down" to a whole dollar amount. This sometimes leads to negligible differences of $1.

[7] The parties have a negligible difference of $1 in their briefs as to this amount. See supra note 6.

amounts which the Government contends add up to the amount of loss.  The Court will also

address Klimovitz's argument that the tax benefit received by Jaxxi should be credited against

the amount of loss.

## A.      Reliability of Government's Evidence

Before examining the separate component amounts, the Court must first address

Klimovitz's general challenge to the primary source of the Government's evidence: Jaxxi's

QuickBooks accounting ledger.  Klimovitz asserts that although he "had formally motioned the

Government to produce the original documents and invoices to establish the accuracy of the

losses alleged," no original invoices were produced.  (See Doc. No. 61 at 1.)  Klimovitz asserts

that the entries in Jaxxi's QuickBooks ledger are not reliable because they cannot "be verified

without examining the actual original documents."  (Id. at 3.)  Klimovitz's expert, James Verano,

a former IRS Agent and Manager of the Scranton IRS Office, testified that the QuickBooks

accounting system "does not have complete accuracy because it allows entries to be deleted or

changed with no audit trail."  (Id. at 3-4.)

The only constraint on evidence introduced for sentencing purposes is that it have a

"sufficient indicia of reliability to support its probable accuracy."  See United States v. Howard,

599 F.3d 269, 271-72 (3d Cir. 2010) (quoting United States v. Miele, 989 F.2d 659, 663 (3d Cir.

1993) (quoting U.S.S.G. § 6A1.3(a))); see also United States v. Inigo, 925 F.2d 641, 660 (3d Cir.

1991) (noting hearsay is admissible for sentencing purposes).  This "sufficient indicia of

reliability" standard of admissibility is to be "rigorously applied."  United States v. Paulino, 996

F.2d 1541, 1547 (3d Cir. 1993) (quoting Miele, 989 F.2d at 664).  Evidence may have a

sufficient indicia of reliability where there is substantial corroborating testimony backing it.  Id.

at 1589-49; see also United States v. Leekins, 493 F.3d 143, 150 (3d Cir. 2005) (noting that the

sentencing court "can infer reliability from a witness's words and actions").  On the other hand,

evidence may lack a sufficient indicia of reliability where it is based on the inconsistent

statements of a single witness and where corroborative evidence is lacking.  Paulino, 996 F.2d at

1548-49.

In cases similar to the one at bar, sentencing courts have determined the amount of loss

based on itemized spreadsheets prepared by the government or the victim.  For example, in

United States v. Ali, the Ninth Circuit agreed with a sentencing court's determination that

spreadsheet evidence was sufficiently reliable:

> The district court relied upon spreadsheets, created by IRS agents,
> that approximated the difference between the full retail price of the
> software sold by Defendants and the AE price Defendants paid for it.
> Though these spreadsheets were admittedly hearsay, the district court
> was justified in relying upon them. . . .  The spreadsheets contained
> substantial detail and were reviewed both by the IRS agents (who
> also sent in sworn affidavits regarding the methodology) and
> Microsoft consultants who reviewed the information. Therefore, the
> district court did not err in its method of calculation of the loss. There
> is sufficient indicia of reliability for the district court to have relied
> on these spreadsheets.

United States v. Ali, -- F.3d ----, Nos. 07-10529, 07-10539, 07-10542, 2010 WL 3329669, at *9

(9th Cir. Aug. 25, 2010); see also United States v. Little, 308 F. App'x 633, 635-36 (3d Cir.

2009) (finding evidence consisting of bank records, victim statements, and police reports was

sufficiently reliable to determine restitution amount); United States v. Humphrey, 104 F.3d 65,

71 (5th Cir. 1997) (finding loss calculation based on a journal found in defendants' home which

included a list of names, dates, and numbers was corroborated by other evidence at trial and

contained sufficient indicia of reliability).

6

The Court finds that Jaxxi's QuickBooks ledger passes the minimal indicia of reliability threshold, by which the Court may make a reasonable estimate of the amount of loss. As an accounting software program, QuickBooks was interfaced with Jaxxi's inventory computer program. Shirmer testified that this interface reflected each invoice that was created, including any payments which were processed:

> There is an inventory system and there is a financial system, and the inventory system interfaced into QuickBooks. . . . [In] [t]he inventory system, a purchase order would be entered by a purchase agent out in Salt Lake. That would have the quantity being purchased and the cost. When the goods are received at either Salt Lake or the Harrisburg warehouse, the person on site would enter a goods receipt. When those goods were received, that created one of the sets of interfaces into our financial information.
>
> When a work order was built or when an item was built, a product development person would put in all the different raw materials into the system. So you would have each individual piece . . . entered in there and an estimate of what your labor costs would be.

(Hearing Tr., July 29, 2010, at 68-69.) Like in the Ninth Circuit decision in United States v. Ali, each of the particular costs associated with the Infinity and Kenny's orders were separately identified in the data sheets prepared by Shirmer.

Klimovitz's argument that an entry may be misplaced in QuickBooks is well taken. However, Klimovitz has not provided the Court with any reason to believe that the entries made into Jaxxi's QuickBooks were fraudulent or mistaken.[8] See, e.g., United States v. Peterson, 312

_____

[8] One particular discrepancy that Klimovitz points to as a reason to doubt the reliability of the Quick Books evidence is that Shirmer's original summary schedule concluded that $609,131 had been paid by Infinity and Kenny's to Jaxxi, but the actual amount paid was $631,763. This discrepancy was an accounting error on the part of Shirmer which was discovered by Verano, Klimovitz's accountant, when he reviewed the entries in the QuickBooks ledger. Shirmer has conceded her mathematical error. Her concession, however, does not cause the Court to doubt the reliability of the QuickBooks accounting software or the original entries

F.3d 1300, 1302 (10th Cir. 2002) (rejecting defendant's challenge to the prosecution's use of victim's itemized spreadsheets and supporting affidavit because defendant failed to "point[] to any evidence supporting the figure he advocate[d], nor any evidence disputing the reliability of the victim's calculations"). To the contrary, on cross-examination, Klimovitz's expert Verano testified that QuickBooks is often used by small businesses as their accounting and inventory control system, and, as a result, such businesses have an incentive to ensure the validity and accuracy of the numbers entered into the system. (Hearing Tr., July 29, 2010, at 109-112.) Therefore, the Court will rely on the numbers derived from Jaxxi's QuickBooks ledger and the testimony of Sponaugle and Shirmer in making the amount of loss determination.

### B. Jaxxi's Costs

The Government asserts that the $938,122 worth of Jaxxi's costs related to Klimovitz's fraud can be separated into three parts: (1) the Cost of Goods Sold ("COGS") for the sales, totaling $792,141; (2) "Other COGS," totaling $105,355; and (3) shipping costs, totaling $40,626. (Doc. No. 60 at 2-4.)

### i. COGS

According to the Government, "COGS consists of every cost specifically assigned to the manufacture of the Kenny's and Infinity Sales candy by Jaxxi's automated inventory/accounting system, e.g.[,] invoices for the purchase of specific Hershey's chocolates, particular tin cans imported from China, labels, wrapping, and labor." (Doc. No. 60 at 2.) These expenses are listed in the spreadsheets put together by Shirmer and submitted as Government Exhibits 3 and 4. The spreadsheets identify "the source of each charge as either a specific invoice, identified by

_____

made in it.

date and invoice number, or General Journal entry, which [is] also identified by date and number." (Doc. No. 60 at 2-3.) The itemized COGS for Kenny's added up to $443,790, while the itemized COGS for Infinity added up to $348,351. (Id. at 3.) Thus, the combined COGS amount is $792,141.

Klimovitz challenges this amount and argues that no "original invoices, purchase orders, and shipping orders" have been produced, and that the numbers "would be much more credible if . . . the original invoices and documents" could be seen to substantiate the figures. (Doc. No. 61 at 3, 9.) Additionally, Klimovitz contends that "[t]he Government's claim of product cost in the amount of $792,141.00 is not consistent with the Jaxxi Profit and Loss Statement." (Id. at 4.) Specifically, Klimovitz argues:

> [T]he sales to Kenny's and Infinity fall in the category of "Mass Market", [sic] defined as everything except "Ma and Pa" groceries. The sales of $2,984,565.00 and the product cost of $1,483,791.00 to all the various mass market customers are detailed in the Profit and Loss Statement. These figures result in an average product cost of 49.67%. The Government contends the product cost on Kenny['s] and Infinity sales are 59.25%; in turn, without the high and therefore skewed and unreasonable cost margins on Infinity and Kenny's goods, the product cost for all other mass market customers would logically be 41.90%.
>
> In a segment of a business, i.e. mass market, it strains reason that margins would swing as widely as indicated by [Jaxxi]. If Kenny['s] and Infinity products had such a higher cost, they would be forced to sell the same or similar products at higher prices than their competition. Therefore, not having the original invoices and documents, CPA Verano testified he could only use a statistical analysis. He calculated the average product cost percentage of 49.67% using the Jaxxi Profit and Loss Statement. Jim Verano, in his expert opinion, concluded that the Government's product cost for Kenny's and Infinity are significantly overstated by $128,112.00.
>
> It is important to note that the defense used the average product cost from the Government's and Mr. Sponaugle's own provided

9

documentation. It again would be the Government's burden of proof
to contradict these claims, and without specific documentation, they
simply did not meet their burden of proof.

(Doc. No. 61 at 4-5 (emphasis removed).) Klimovitz's argument is that the itemized list of

expenses put together by Shirmer and included as Government Exhibits 3 and 4 arrives at a final

sum that is too high when compared to the other mass market products sold by Jaxxi. As an

alternative, Klimovitz introduces the statistical analysis performed by Verano which arrives at an

average cost of all mass market products. Under that formula, the cost of Jaxxi product for the

Infinity and Kenny's sale drops from $792,141 to $664,029. (See Def's. Ex. 2.)

The Court is unpersuaded by Klimovitz's argument that such a recalculation is warranted

here – especially given the itemized listings included as Government Exhibits 3 and 4. Verano

testified that his understanding of "mass market" products is that it includes only "one product or

one type of product." (Hearing Tr., July 29, 2010, at 122-23.) He bases this understanding

solely on the representation of Klimovitz. (Id. at 122.) However, Klimovitz has not provided

the Court with any reason to believe that the product designed for sales to Kenny's and Infinity

would cost the exact same as other "mass market" products designed for other companies.

Therefore, the Court is not persuaded that Verano's statistical analysis is warranted or that it is a

better estimate of the COGS where Jaxxi's itemized QuickBooks entries are available.

As corroborative evidence of the Government's COGS estimate, the Court finds

Defendant's Exhibit 3 to be very helpful. According to Klimovitz, Defendant's Exhibit 3 is a

copy of a handout that Sponaugle gave to Klimovitz and other Jaxxi employees at a company

meeting in Harrisburg. (Hearing Tr., July 29, 2010, at 127-28.) It purportedly includes the year-

end results for Jaxxi sales in 2007. The sales price listed for Kenny's is $671,233.40 and the

10

sales price for Infinity is $624.777.60, for a combined sales price of $1,296,011.  (See

Defendant's Ex. 3.)  The COGS listed on the exhibit for Kenny's is $407,120.75 and for Infinity

is $358,668.83, for a combined COGS of $765,789.58.  (Id.)

These numbers from Defendant's own exhibit align closely with the estimates put

forward by the Government, and bolster the Court's finding that Jaxxi's QuickBooks entries are

sufficiently reliable.  The combined sales price of Kenny's and Infinity sales listed on the

Defendant's exhibit ($1,296,011) corroborates the testimony of Sponaugle that the combined

sales price for that order was approximately $1.3 million.  There is a $26,352 difference from the

Government's estimated number as to the COGS ($792,141) from Defendant's Exhibit 3

($765,789).  Given that this sheet appears to have been prepared before the product was shipped

to Kenny's and Infinity, it is understandable that the COGS predicted on the handout would

ultimately be different once the order was completed.  Even with this difference, the Court

cannot say that the Government's evidence is not a reasonable estimate of the amount of loss

necessary for sentencing purposes.  Indeed, the Government's estimate ($792,141) is much

closer to the COGS amount included in Defendant's Exhibit 3 ($765,789) than the estimate

reached by the statistical approach advocated by Klimovitz's expert ($664,029).  Therefore, the

Court will decline to adopt the statistical approach advocated by Klimovitz, and will adopt the

Government's COGS estimate of $792,141.

### ii.      Other COGS

In regard to the Other COGS allocation, the Government has put forward an amount

totaling $105,355.  In its brief, the Government explains how this number was reached:

> "Other COGS" entailed expenses and income that were involved in
> Jaxxi's manufacturing process but were not specifically assigned to

particular products[.] These costs and credits, which Shirmer itemized into 20 different categories, entailed expenses such as Import Duties, Import Freight, Interwarehouse Transfer Costs, Warehouse Supplies, and Product Testing. . . . Seven of the 20 categories involved credits, such as Purchase Discounts, Set Up Income, Fulfillment Income and Labor Variance, that actually lowered the cost of production. . . .

Shirmer allocated the Other COGS figures for the Kenny[']s and Infinity Sales product by comparing Jaxxi's annual Other COGS for the year ($583,576) to the Company's annual COGS number for 2007 ($4,367,238). . . . This percentage, 13.36% was then applied to Kenny[']s COGS ($443,790), which resulted in an allocation of $59,024 in "Other COGS" expense for Kenny[']s. Applying the same methodology to Infinity Sales yielded an Other COGS of $46,331 for Infinity Sales. Together, the total Other COGS expense for both companies was $105,355.

(Doc. No. 60 at 3-4 (footnote omitted).) Shirmer further explained during her testimony that a

percentage amount was necessary because the costs could not be "assign[ed] directly to an item

through [the Jaxxi] inventory system." (Hearing Tr., July 29, 2010, at 71.) Because the Other

COGS for the Kenny's and Infinity orders were not separately listed, Jaxxi was able to arrive at

a reasonable estimate of those costs by applying the 13.36 percentage across-the-board.

In response to this use of a percentage estimation by Shirmer, Klimovitz asserts that the

numbers set forth by the Government are unreliable:

Here, the Government allocates $105,355.00 [to "other COGS"]. However, they used a percentage when they could have identified most of these expenses and tied them directly to the products in question if the supporting invoices were reviewed. Thus, [the Government's] proof failed, and this number should be suspect.

(Doc. No. 61 at 5.)

The Court is not persuaded by Klimovitz that the percentage adopted by the Government

in determining the Other COGS is unreliable. The Court agrees that listing specific expenses

12

would be preferred over the estimate arrived at by Shirmer and advocated for by the

Government. However, the Court is unable to say that, given the nature of the Other COGS at

issue, the Government's estimate is unreasonable. Rather, the Court finds that the amount

calculated by applying the 13.36 percentage is a "reasonable estimate" of the loss necessary for

sentencing purposes. See Ali, 508 F.3d at 145; U.S.S.G. § 2B1.1 app. n.3(C).

### iii. Shipping Costs

The shipping costs paid by Jaxxi for the Infinity and Kenny's orders are outlined in

Government Exhibit 5. Jaxxi paid $27,742 in shipping for the Infinity order and $12,884 in

shipping for the Kenny's order, for a combined total cost of $40,626. (See Doc. No. 60 at 4.)

Klimovitz has not challenged this amount. Therefore, the Court finds that it is a reasonable

estimate of Jaxxi's loss as to shipping.

### C. Bonus Paid to Klimovitz

The next issue before the Court is whether Klimovitz earned the $23,000 paid to him in

the form of a commission and a bonus or whether that amount should be added to the loss.

According to Sponaugle, it was agreed that Klimovitz would earn a $16,000 bonus if Jaxxi

reached $8 million in sales. However, Government Exhibit 8, an unsigned employment contract

between Jaxxi and Klimovitz, does not define the "planned sales goal" amount. (See Gov't Ex.

8.) Klimovitz contends that the sales goal in question was actually $6.3 million. (Doc. No. 61 at

6.) He argues that his number is more reasonable because Jaxxi's 2006 sales were for

approximately $5.4 million, and in order to reach $8 million the next year, Jaxxi would have to

increase its sales by 32.79 percent. (Id. at 6-7.) As a result, Klimovitz has subtracted the

$16,000 that he states he "legitimately earned" by his efforts to increase Jaxxi's performance in

the market.  (Id. at 7 (emphasis removed).)

The Court credits the testimony of Sponaugle that the agreed sales goal was $8 million. The Court is specifically persuaded by Sponaugle's testimony that the main reason the bonus was paid to Klimovitz early was because Klimovitz had falsely represented that he was to undergo brain surgery.  (Hearing Tr., July 29, 2010, at 20.)  Accordingly, the Court will include in the amount of loss the $23,000 bonus and commission paid to Klimovitz by Jaxxi.

### D.      Tax Benefit to Victim

In addition to challenging the Government's evidence, Klimovitz argues that, because Jaxxi realized a $52,178 tax benefit from the loss it sustained, that amount should be subtracted from the amount of loss.  (See Doc. No. 61 at 7.)  Klimovitz cites to the Commentary to U.S.S.G. § 2B1.1 which states that "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected" should be credited in favor of a defendant.  See U.S.S.G. § 2B1.1, app. n.3(E)(I).  This argument is inapplicable to the present case, however, because no corrective action was taken "by the defendant or other persons acting jointly with the defendant."  Id.  Rather, any tax benefit received by Jaxxi as a result of the wrongdoing by Klimovitz was received in spite of his actions.  Therefore, the Court will reject crediting the tax writeoff amount against the amount of loss.

## IV.     CONCLUSION

To summarize, the Court finds that the amount of loss calculation for sentencing purposes is as follows: (1) Jaxxi's costs for manufacturing and shipping ($938,122); plus (2) the commission paid to Klimovitz for his fraudulent sale ($23,000); minus (3) the sale to Infinity and

14

Kenny's ($631,763).  Based on this calculation, the reasonable estimated amount of loss is

$329,359.  Klimovitz will be sentenced in accordance with this finding.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: October 20, 2010